

FILED

AUG 4 2016

CLERK, US DISTRICT COURT
NORFOLK, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

**KELSEY L. ANTEE,**

        **Plaintiff,**

    **v.**

**CAR DIRECT, LLC ,**

      **SERVE:**      **Howard R. Sykes, Jr.
281 Independence Blvd., 5th Floor
Pembroke One Building
Virginia Beach, VA 23462**

**and**

**BEACH AUTO BROKER, INC.,**

      **SERVE:**      **Howard R. Sykes, Jr.
281 Independence Blvd., 5th Floor
Pembroke One Building
Virginia Beach, VA 23462**

      **Defendants.**

Civil Action No. 2:16cv 477

**JURY TRIAL DEMANDED**

**COMPLAINT**

COMES NOW the plaintiff, Kelsey L Antee, formerly known, during the events

described herein, as Kelsey Wegner (hereinafter "Ms. Wegner" or "Ms. Antee"), by counsel, and

moves this Court for entry of judgment in her favor and against the defendants, Car Direct, LLC

("Car Direct") and Beach Auto Broker, Inc. ("Beach Auto") (collectively, "defendants"), and in

support of this Complaint alleges as follows:

## Nature of Action

1.      This is an action at law arising out of discrimination on the basis of hostile work environment sexual harassment, quid pro quo discrimination, and retaliation in the course of defendants' employment of Ms. Wegner, as well as certain common law claims.

2.      This action states federal claims against Car Direct and Beach Auto for discrimination on the basis of hostile work environment sexual harassment, quid pro quo discrimination, and retaliation, all under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

## Parties

3.      Ms. Wegner is a Hispanic female citizen of the United States. At the time described herein she was a resident and citizen of the City of Virginia Beach, Virginia. She is currently a resident and citizen of Key West, Florida. Since the events alleged herein, she has married and changed her name to Kelsey L. Antee.

4.      Ms. Wegner was an employee of Car Direct within the meaning of 42 U.S.C. § 2000e(f) from January, 2014 to September 17, 2015, in the position of "Internet Manager."

5.      Ms. Wegner was an employee of Beach Auto within the meaning of 42 U.S.C. § 2000e(f) from July, 2014 to August 2015, with the position of "Internet Manager."

6.      Car Direct is an employer within the meaning of U.S.C. § 2000e(b) at all times relevant to this action.

7.      Car Direct does business in Virginia Beach, Virginia.

8.      Car Direct is engaged in an industry affecting commerce and has had more than 15 employees for each working day in each of the twenty-one or more calendar weeks in the

current or preceding year, and during all times alleged herein, within the meaning of 42 U.S.C.§ 2000e(b).

9.      Beach Auto is an employer within the meaning of U.S.C. § 2000e(b) at all times relevant to this action.

10.     Beach Auto does business in Norfolk, Virginia.

11.     Beach Auto is engaged in an industry affecting commerce and has had more than 15 employees for each working day in each of the twenty-one or more calendar weeks in the current or preceding year, and during all times alleged herein, within the meaning of 42 U.S.C.§ 2000e(b).

12.     Brian Jones is the broker/dealer in charge of managing and overseeing both Car Direct and Beach Auto.

## Jurisdiction and Venue

13.     This Court has jurisdiction over Ms. Wegner's claims under Title VII of the Civil Rights Act of 1964, as amended, pursuant to 42 U.S.C. § 2000e-5(f)(3).

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332 over Ms. Wegner's claims of sex discrimination in violation of Ms. Wegner's equal protection rights under the Fourteenth Amendment.  This Court has supplemental jurisdiction over Plaintiff's common law claims in Counts IV-VI by virtue of the Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

15.     The defendants presently, and regularly, conduct affairs and business activities throughout eastern Virginia and did so at all times alleged herein.

16.     The causes of action arose from the defendants acts and omissions in Virginia.

17.     Unlawful employment practices committed by the defendants occurred in this judicial district. The defendants do business in this judicial district and the plaintiff lived in this judicial district at all relevant times.

18.     Venue over the claims of Ms. Wegner under Title VII is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b).

## Procedural Status

19.     On November 4, 2015, Ms. Wegner timely filed administrative Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination against her by Car Direct and Beach Auto Brokers on the basis of sexual harassment and retaliation. **Exhibits 1 and 2.**

20.     More than 180 days have elapsed since the filing of Plaintiff's Charge of Discrimination. The EEOC has issued a Right to Sue Letter regarding both defendants on May 17, 2016. **Exhibit 3 and 4.**

21.     This Action is timely filed and all procedural prerequisites to suit have been met.

## Facts

22.     From January, 2014 through September 17, 2015, as stated with particularity below, Car Direct and Beach Auto Brokers supervisors and employees subjected Ms. Wegner to severe and pervasive hostile work environment sexual harassment and quid pro quo sexual harassment despite the actual and constructive knowledge of both defendants' supervisory personnel and ownership.

23.     When Ms. Wegner took protected action in response to sexual harassment, both defendants unlawfully retaliated against her.

24. All acts and omissions of the agents, employees, managers and owners of both defendants described herein were committed within the scope of their employment.

25. In January, 2014, Ms. Wegner began her employment with Car Direct, which is located at 4740 Shore Drive, Virginia Beach, Virginia. Ms. Wegner's job was to manage the online inventory of automobiles that the company sold. Her job responsibilities also included work as a title clerk coordinating Department of Motor Vehicle applications, making bank deposits, and other miscellaneous duties. She worked full time and her pay was $10 per hour plus $10 per car she posted online.

26. In February or March of 2014, Ms. Wegner began working at Car Direct's sister company, Beach Auto Brokers, which is located at 3510 E. Little Creek Road, Norfolk, Virginia. Ms. Wegner's job responsibilities and compensation were the same at both companies.

27. Including compensation from both companies, Ms. Wegner made approximately $1,700 a month gross during her first six to eight months of employment. Beginning in July or August 2014 and throughout the remainder of employment, she made approximately $3,400 a month gross; she was compensated $400 per week by each defendant dealership, for a total of $800 per week (during this time she was no longer paid $10 per car posted online).

28. Ms. Wegner routinely worked at both Car Direct and Beach Auto Brokers, on a daily basis, and would be instructed to go back and forth between establishments, as if working for one employer.

29. Both Car Direct and Beach Auto Brokers are managed and operated by Brian Jones, who oversees operations at both companies and has authority over the General Managers of each company and all employees at each company.

30. Brian Jones is the son of Alex Jones, who owns both Car Direct and Beach Auto Brokers.

31. Upon information and belief, other members of the Jones family have ownership interests in both Car Direct and Beach Auto Brokers.

32. Brian Jones job title at Beach Auto Brokers is Dealer-Operator. His title at Car Direct is Dealer-Operator, as well as Owner – he owns Car Direct together with other member(s) of his family.

33. Numerous employees and supervisors work at both Car Direct and Beach Auto Brokers, and a company culture permitting, tolerating, and encouraging severe and pervasive sexual harassment permeates the workplace at both companies.

34. Ms. Wegner endured verbal and physical harassment beginning when she started working at Car Direct in January and throughout her employment with Car Direct.

35. Ms. Wegner was also subjected to verbal and physical harassment throughout her employment with Beach Auto Brokers.

36. From January through August, 2014, her supervisor and boss at Car Direct, Patrick Yerigan ("Yerigan"), whose job title was Sales Manager and part of the Management Team, and who hired Ms. Wegner and had authority to affect Ms. Wegner's employment status, including terminating her, deciding whether or not to award a raise in compensation, conduct employment evaluations, etc., constantly referred to Ms. Wegner as "Baby" and made innumerable sexually harassing comments to her, e.g., "If you spend one night with me, you will never even remember your boyfriend's name." Yerigan often made sexually derogatory comments to Ms. Wegner regarding her weight. Yerigan constantly told Ms. Wegner she looked

pregnant.  Whenever there were several people around, Yerigan would often ask Ms. Wegner when she was "due," and, "Are you eating for two?"  During a sales meeting Yerigan stated, "It's not over until the fat lady sings" and then turned to Ms. Wegner and asked, "Hey Kelsey [Wegner], are you singing yet?"  Yerigan would often walked up to Ms. Wegner's desk and shook Ms. Wegner or her chair or grabbed and shook her legs while yelling, "Wake up!"  Other times Yerigan hit her chair and yelled at her.  Yerigan also made racially derogatory statements to Ms. Wegner that had sexual intonations.  For example, he would say, "I bet I could work the hell out of a weed eater."  Co-workers such as Paulis Turner ("Turner") and supervisors such as office manager Renee Boone ("Boone)" witnessed this ongoing harassment.

37.     Numerous times between February and June, 2014, Car Direct lot attendant employee Sam [last name unknown], verbally sexually harassed Ms. Wegner, with statements such as, "You look sexy today" and "You have a nice ass."  In May 2014, Sam stated to Ms. Wegner, "Damn baby, you look good;" "Stand in front of the fan and dance for me;" and "I should spray you down with this hose. I bet you would look sexy dripping wet."  Co-workers such as Turner and supervisors such as office manager Boone witnessed this ongoing harassment.

38.     In June, 2014, Car Direct salesman Marty Hernandez ("Hernandez") walked by Ms. Wegner's desk, pulled her hair hard, and said, "What's up, baby."  Ms. Wegner said, "Marty, don't pull my hair.  Hernandez responded, "Oh, so you don't like it rough?"

39.     Severe and pervasive hostile work environment sexual harassment also routinely occurred at Beach Auto Brokers.  For example, approximately one month after Ms. Wegner started working there, Beach Auto Brokers car detailer and lot attendant Nick Caputo ("Caputo"), a company favorite and personal friend of Brian Jones, who also performs personal work for

Brian Jones at his house, began sending Ms. Wegner numerous text messages calling her a "bitch." Caputo continued texting Ms. Wegner throughout the summer of 2014, repeatedly sending her sexually derogatory and threatening texts that routinely included statements such as "I hope you die," "go kill yourself," and "when are you going to kill yourself already."

    40.    In addition to the sexual harassment described herein, Ms. Wegner was called derogatory, racist names by her manager Yerigan and others. The racial slurs included "beaner," "spic," and "wetback." The racial slur "nigger" was also repeatedly uttered in Ms. Wegner's presence. Although Ms. Wegner has not alleged racial discrimination, being subjected to derogatory racial slurs was demeaning and, in the context of the sexual harassment to which she was routinely subjected, part and parcel of the discrimination she endured.

    41.    Ms. Wegner repeatedly reported the sexually harassing texts to managers Julie Taft ("Taft"), the Human Resources Manager for Car Direct, as well as Car Direct General Manager Donnie Howard ("Howard"), who both laughed at the harassment and dismissed it as "just a joke."

    42.    In approximately July, 2014, as a result of a hostile work environment and ongoing severe and pervasive sexual harassment by both supervisors and co-workers routinely occurring at both defendants' workplaces, of which both defendants had actual or constructive awareness, and because neither defendant had a sexual harassment policy in place, and because no corrective action had been taken despite Ms. Wegner reporting sexual harassment to human resources and management (Taft and Howard) – Ms. Wegner reported the sexual harassment to officer manager Boone.

    43.    Ms. Wegner reported said harassment to Boone out of desperation because she

was a relatively new employee, because no sexual harassment policy existed, and because she did not know which other management or ownership personnel to whom to report the harassment. This problem of not knowing to whom to report harassment was exacerbated because her managers, such as Howard and Yerigan, participated in and/or laughed along with the harassment.

44.     Ms. Wegner received no sufficient assurances that corrective action would be taken from Boone.

45.     Ms. Wegner, constructively discharged because no reasonable employee could be expected to endure the sexual harassment to which she continued to be subjected, gave two weeks notice of her resignation.

46.     After submitting her resignation, Ms. Wegner was called into Brian Jones office at Beach Auto Brokers to "talk."  Ms. Wegner explained that she was being forced to resign because she could no longer tolerate being constantly sexually and harassed, as well as being called racist names, by her supervisors and co-workers

47.     Ms. Wegner reported the ongoing verbal and physical sexual harassment to Brian Jones.  Ms. Wegner told Brian Jones that salesmen and managers would harass her as alleged above, walk by her desk and rub against her, pull her hair, make inappropriate and vulgar sexual comments about coitus and Ms. Wegner's body.  She provided specific details to Brian Jones regarding the harassment described above, including the harassment by her supervisor Yerigan.

48.     Brian Jones told Ms. Wegner that he would stop the sexual harassment and thereafter promulgated a written sexual harassment policy. See **Exhibit 5**.  However, this policy was not enforced and did not prevent further harassment.

49.     Brian Jones also told Ms. Wegner he would fire Ryan Flavin ("Flavin") and give her Ryan and Flavin's job and a corresponding raise, which did occur in the ensuing weeks. However, Ms. Wegner had no complaint regarding Flavin. Brian Jones fired Flavin for reasons unrelated to the harassment of Ms. Wegner.

50.     In reliance on Brian Jones assurance that the sexual harassment would stop, Ms. Wegner withdrew her resignation notice.

51.     However, the sexual harassment continued without stopping.

52.     In August or September of 2014, approximately two to three months after withdrawing her resignation, Ms. Wegner complained again to Brian Jones about sexual harassment. Among other incidents, Ms. Wegner complained the Caputo continue to send her sexual and threatening texts. Ms. Wegner also complained that the widespread harassment described in detail above had continue unabated.

53.     Brian Jones assured Ms. Wegner that he would take corrective action by counseling one of the perpetrators, Caputo. However, no substantiative corrective action occurred. Neither Caputo nor any of the other employees who routinely harassed Ms. Wegner were effectively counseled or disciplined, nor did the harassment stop.

54.     Rather, in retaliation to Ms. Wegner's complaints about sexual harassment, Brian Jones encouraged escalated harassment. For example, Brian Jones minimized, belittled and sexually derided Ms. Wegner when he told male managers Ms. Wegner had complained because she was "hormonal."

55.     In October, 2014, Beach Auto Brokers employee Caputo texted Ms. Wegner pictures of a naked man.

56.     Thereafter, in October, 2014, Ms. Wegner reported this harassment and showed the picture to Taft and Howard.  During the conversations regarding the text depicting a naked man, Ms. Wegner further reported to Taft and Howard that she had been subjected to the ongoing sexual harassment described above.

57.     When Taft and Howard, the human resources director and manger, respectively, did nothing, dismissed the text as a joke, and told her not to report the text to Brian Jones, Ms. Wegner reached a breaking point.  Desperate for corrective action, Ms. Wegner defied Taft and Howard's instructions and reported the vulgar text, as well as the ongoing harassment described above to Brian Jones.

58.     No effective corrective action was taken in response to Ms. Wegner's reports of sexual harassment.  Instead, with the actual or constructive knowledge, as well as the actual or constructive permission of management, Caputo and others escalated the sexual harassment of Ms. Wegner to include further threats.

59.     Caputo continued to harass Ms. Wegner on numerous occasions with statements such as, "Go fuck yourself;" "I hope you die;" and "You're a little bitch."  Caputo also made similarly threatening verbal statements to Ms. Wegner, such as "go kill yourself" and "fuck off."

60.     After Ms. Wegner reported Caputo's harassment, instead of effective corrective action eliminating the unlawfully hostile work environment, management spread the word hostilely that Ms. Wegner had complained.  As a result, numerous employees at both defendant workplaces retaliated with increased harassment, which was tolerated and effectively promoted by management.

61.     For example, in October, 2014, while Ms. Wegner was taking pictures of a car,

Beach Auto Brokers salesman CJ Bondhill approached Ms. Wenger and told her, "You're looking sexy today. You got some sexy ass hips." Harassment of this sort occurred on a routine basis through the end of 2014.

62.     From early 2015 through August, 2015, Car Direct employee Donte Taylor ("Taylor"), a lot attendant, repeatedly and habitually, on a daily basis, referred to Ms. Wegner as "baby" or "sexy." Taylor routinely grunted, moaned and made other sexual noises when he saw Ms. Wegner at work. Taylor often, on a daily basis, winked and/or blew kisses at Ms. Wegner. Taylor made many sexually harassing statements, on more than 20 occasions, to Ms. Wegner, such as, "Your man can't do it like me." Taylor repeatedly walked up to Ms. Wegner's desk and dropped a pen or a note pad and stared at Ms Wegner and asked her, "So are you going to pick it up?" On April 30th, Taylor stood at the door by Ms. Wegner's desk and groped, pushed his body up against the door and rubbed the door with his hand as if the door were a woman, while staring at Ms. Wegner. Also, in approximately mid-June, 2015, Taylor repeatedly made sexual demonstrations by groping the door immediately adjacent to Ms. Wegner's desk, rubbing his body against the door, and licking the door while staring incessantly at Ms. Wegner.

63.     From approximately April, 2015, through August, 2015, Car Direct employee Jason [last name unknown], a lot attendant, made many sexually harassing comments to Ms. Wegner. Jason routinely referred to Ms. Wegner as "Baby." Jason often approached Ms. Wegner's desk made remarks such as, "Oh Kelsey, I love you;" "You're looking sexy today;" "Damn girl, you're looking good;" "When are you going to let me get that;" and "Bend over Kelsey, I think you dropped something." Jason often stated, with sexual intonation, "Hey Kelsey, you dropped your pen!" as Ms. Wegner walked by. Jason repeatedly, more than 20

times, walked up to Ms. Wegner and dropped a pen at her feet and asked her to bend over and pick it up for him. Jason asked Ms. Wegner several times to step outside the garage because the weather was windy and she was wearing a skirt or dress. Jason would often, more than 20 times, grunt and moan as Ms. Wegner walked by, and blow kisses at her. When Ms. Wegner tried to ignore Jason he and walk away, he shouted after her, "that's alright, I like this view too!"

64.    Also during approximately April, 2015, to July, 2015, Car Direct employee Gabriel Rodriguez, would join in with Jason's harassment, echoing, "Hey Kelsey, you dropped your pen!" and "I think you dropped something."

65.    In approximately May, 2015, Ms. Wegner complained about this conduct to Car Direct supervisor Taft, office manager responsible for human resources. Taft told Ms. Wegner, as she had done in the past, that she should not complain about sexual harassment to Brian Jones because he was too busy.

66.    In approximately May, 2015, on a weekly basis, several employee detailer and lot attendants at Car Direct and Beach Auto Brokers told Ms. Wegner to watch her back because Caputo and Car Direct employee Gabriel Rodriguez, a friend of Caputo's, and other employees, were trying to get her terminated in retaliation for her complaints about Caputo's sexual harassment.

67.    When Ms. Wegner expressed concerns regarding her job security to her supervisor Yerigan, he responded hostilely by staring at her and walking away without replying.

68.    After reporting sexual harassment to Taft in May, Ms. Wegner experienced a retaliatory hostile work environment that made her job performance more difficult. For example, Taylor and Jason refused to work with Ms. Wegner regarding recording the inventory of new

cars, which made it impossible for Ms. Wegner to properly complete her job duties.

69.     On July 27th at 9:30 a.m., Ms. Wegner again reported to Taft continued sexual harassment from Donte and Jason. Because the harassment was ongoing and no corrective action had been taken, Ms. Wegner asked Taft if she should report the harassment to additional management at the "bucket meeting." Taft responded dismissively, "Well, I haven't seen them do it in a couple of weeks so you should be fine."

70.     Many times Taft, human resources manager, directly witnessed the defendants' employees sexually harass Ms. Wegner. For example, she often witnessed Jason, Donte and Gabe Rodriguez ("Rodriguez") drop their pens and tell Ms. Wegner to bend over or ask her to stand outside in the wind so they could see her skirt blow up. Taft also witnessed these employees tell Ms. Wegner they loved her and blowing kisses on numerous occasions.

71.     On August 11th, at approximately 8:30 a.m., because Ms. Wegner continued to be subjected to retaliation and hostility in response to her reports of sexual harassment, which included male co-workers shunning her and collectively refusing to cooperate with her so that she could perform her job duties, a verbal confrontation occurred when Ms. Wegner asked Rodriguez why she was not receiving any texts for newly detailed cars, so that she could post pictures of the cars online, which was a duty of her job.

72.     During this confrontation, in the presence of Howard, Rodriguez stood up and stood approximately one foot away from Ms. Wegner and began screaming obscenities and derogatory comments directly into Ms. Wegner's face, telling her that he did not like her, that she was "fucking irritating," etc. Ms. Wegner became upset and asked Howard for help. Howard did nothing. This hostile behavior occurred because of Ms. Wegner's reports of sexual harassment,

which management had in retaliation maliciously spread throughout defendants' workforce.

73.     Ms. Wegner called Brian Jones and informed him of the argument. At a meeting approximately two hours later that day, August 11th, Brian Jones stated to managers Howard and Yerigan, in Ms. Wegner's presence, that Ms. Wegner was "a woman who is built differently and who has more hormones then guys do; she is more likely to get upset at these comments." Brian Jones also stated that because Ms. Wegner is female she is more likely to cry and become upset and offended at sexually harassing comments.

74.     Later that day, August 11th, Brian Jones held a private meeting with Ms. Wegner. She stated her concerns about being subjected to an ongoing hostile work environment and sexual harassment. Brian Jones dismissed her concerns, stating that Taylor and Jason were not trying to "come onto" or "hit on" Ms. Wegner but merely joking. Brian Jones again told Ms. Wegner that she was to blame for being sexually harassed, belittling her and stating again that she was a woman "with hormones," that she had no valid reason to be "upset," and that the reason she was upset was because she was "built differently than a man."

75.     During this meeting Ms. Wegner told Brian Jones again about the ongoing sexual harassment she had been subjected to by Caputo, Rodriguez, Taylor, Jason and others, and also reiterated that she had repeatedly complained both to him (Brian Jones) and human resources manager Taft, and that Taft had witnessed much of the harassment, but that no effective corrective action had been taken. Ms. Wegner reported to Brian Jones that each time she complained about sexual harassment to Taft, she was told by Taft that the harassment was not "a big deal" and that she should not bring it up.

76.     Ms. Wegner told Brian Jones during this meeting and on several other occasions

that she felt unsafe working at Car Direct due to hostile work environment sexual harassment. Ms. Wegner was very upset during this meeting because during that morning's confrontation Rodriguez had screamed in her face many debasing comments. Ms. Wegner was hysterically crying and shaking as she explained her predicament to Brian Jones.

77.     Following the above-described events of August 11, 2015, the defendants' employees were instructed not to talk or communicate with Ms. Wegner. This policy did not forbid sexually harassing Ms. Wegner; rather, it isolated her entirely and thereby compounded the hostile nature of her work environment.

78.     On August 24, 2015, in retaliation for Ms. Wegner's complaints of sexual harassment, Car Direct issued Ms. Wegner a pretextual Employee Counseling Report (**Exhibit 6**), from Car Direct General Manager Howard, that warned and corrected Ms. Wegner for allegedly yelling at another employee, when in fact Ms. Wegner been yelled at by Rodriguez, as was known by Brian Jones, Howard and defendants' management. This was the first adverse write-up of any kind Ms. Wegner had ever received while working for Car Direct and Beach Auto Brokers for more than eighteen months.

79.     On August 26, 2015, Brian Jones and Taft instructed Ms. Wegner to write down a summary of *recent* sexual harassment incidents – she was told that she would also be asked to provide a subsequent report detailing less recent incidents, although this never occurred. She was instructed to write down the statement immediately, in Taft's office and with Taft looking over her shoulder. She was not permitted to call her mother or husband, nor was she allowed to take any breaks or leave the room until she finished. Under these circumstances, Ms. Wegner's statement only partially described the sexual harassment she had suffered, including selected

examples of recent harassment. **Exhibit 7**.

80.     The following day, August 27, 2015, in retaliation against Ms. Wegner for
complaining of sexual harassment and writing the requested summary, Car Direct posted Ms.
Wegner's job position online to be filled by someone else. **Exhibit 8**.

81.     On August 27, 2015, Brian Jones presented Ms. Wegner with a memo, dated
August 26, 2015, imposing new job performance requirements for clocking in and out. Whether
or not this memo was given to other employees, the retaliatory policies outlined in the memo
were directed solely against Ms. Wegner, in that the new requirements were specifically designed
to interfere with Ms. Wegner's academic schedules, which were known about and previously
accommodated by both defendants, in an effort to encourage Ms. Wegner to resign and/or
provide grounds for termination.

82.     On August 31, 2015, Brian Jones gave employees another memo, dated August
28, 2015, ostensibly to provide protection from sexual harassment. **Exhibit 9**. However, this
memo placed new restrictions on Ms. Wegner (not the employees who harassed her) in
retaliation for her sexual harassment complaints.

83.     These actions were part of an ongoing effort to induce Ms. Wegner to quit. She
tolerated an unbearably tense working environment for more than three months as it became
increasingly obvious that the defendants wanted her to quit. For example, Brian Jones asked Ms.
Wegner, on August 24, 2015, "Why haven't you quit already?"

84.     The sexual harassment continued until Ms. Wegner was terminated on September
14, 2015 by Beach Auto and September 17, 2015 by Car Direct.

85.     On September 14, 2015, while working at Beach Auto Brokers, Ms. Wegner

received a phone call from Howard telling her to stop doing the work she was in the middle of and report to Car Direct. In a meeting with Howard, Taft, Brian Jones told Ms. Wegner that she "was no longer an employee at Beach Auto Brokers" and to not return there. Ms. Wegner had not been previously notified that her position at Beach Auto Brokers would be terminated. Ms. Wegner given an option of working at either Beach Auto Brokers or Car Direct. Ms. Wegner was not told in advance of this meeting about this change in her job status. Thereafter, Ms. Wegner did not work at Beach Auto Brokers.

86. If Ms. Wegner had been given an option of working at either Beach Auto Brokers or Car Direct, she would have chosen Beach Auto Brokers because, as she repeatedly told Brian Jones and other management personnel, she felt unsafe working at Car Direct.

87. During the same meeting, on September 14, 2015, Brian Jones told Ms. Wegner that her new hours at Car Direct would be Monday through Friday, 9:00 a.m. to 5:00 p.m., and that she could not clock in before 9:00 a.m. Previously Ms. Wegner's hours had been approximately 8:00 a.m. to 4:00 p.m., which allowed her enough time to get to school after work. The new schedule would have made Ms. Wegner late for class, so she asked Brian Jones if the prohibition against clocking in prior to 9:00 a.m. applied to all employees, and Brian Jones stated that, no, the prohibition applied only to Ms. Wegner.

88. When Ms. Wegner told Brian Jones the new schedule would cause her to be late for class every day, Brian Jones pretended he had not known she attended class in the evenings. He was, however, well aware of her class schedule and had been for many months. About six months earlier she had asked him if it would be a problem if she started attending classes after work, and he had told her it would not be.

89.     Prior to being terminated at Beach Auto Brokers and having her hours changed at Car Direct, Ms. Wegner worked approximately 30-35 hours each week and left every dat at 4:30 p.m.

90.     After being terminated from Beach Auto Brokers, Ms. Wegner was told she must work 40 hours per week at Car Direct and that she would not be permitted to report to work before 9 a.m. Ms. Wegner was the only employee not permitted to begin work before 9 a.m. Ms. Wegner was also told she could not leave before 5 p.m. or she would be written up. Further, manager Howard began routinely inspecting Ms. Wegner's time card, which was not done to any other employee. This discriminatory job condition applied only to Ms. Wegner and was intended to, and did in fact, interfere with her school schedule. The defendants applied this discriminatory job condition, along with other retaliatory actions described herein, which together comprised work conditions no reasonable employee would be expected to tolerate, to Ms. Wegner in an attempt to constructively discharge her.

91.     Ms. Wegner complained to Brian Jones that the retaliatory job conditions would interfere with her school schedule. Brian Jones untruthfully stated he did not know Ms. Wegner was enrolled in school. In fact, Brian Jones had previously encouraged Ms. Wegner to start school and told her that he would accommodate her school schedule.

92.     In order to perform certain job responsibilities, such as taking pictures of cars to post online, Ms. Wegner had to use her cell phone at work. On September 16, 2015, in further retaliation for complaints of sexual harassment, Ms. Wegner was informed by Brian Jones that she must sign a memo (**Exhibit 10**), which, among other things, would have effectively given Car Direct managers the right to inspect her personal cell phone contents, including private

information. This memo, issued in retaliation, singled out Ms. Wegner because, unlike other employees, she did not have the option of not bringing her phone to work because she was required to use it to take and post pictures of cars. Ms. Wegner signed the form, but only after hand writing on the memo a statement that no one was allowed to look at her telephone under any circumstances. Ms. Wegner was told she must sign the form "as is," but she refused to do so.

93.    During the same time period wherein Ms. Wegner was asked to sign these memos, Brian Jones stated to her that the defendants' lawyer was preparing memos for her signature, that the defendant' lawyer had advised him to prepare a more comprehensive handbook and policy regarding sexual harassment, and that the defendants' lawyer had written the new policy that prohibited employees from interacting with Ms. Wegner. Brian Jones also stated that the defendants' lawyer had advised him to require Ms. Wegner to clock in and out of work and made her sign a memo acknowledging this new policy.

94.    Brian Jones actions and statements at this time made Ms. Wegner fearful that the defendants were preparing to terminate her and seeking legal counsel regarding how to do so without exposing themselves to liability.

95.    In retaliation for complaining about sexual harassment, under the pretext that she would not consent to have her cell phone searched by management, a policy which applied uniquely to Ms. Wegner, with retaliatory discriminatory intent, because she alone had to take pictures of cars to post online, on September 17, 2015, Ms. Wegner was terminated by Howard and Taft.

96.    During the meeting with Howard and Taft in which Ms. Wegner was fired the

defendants' managers, because they were aware they were engaged in an unlawful retaliatory discharge, went to great lengths to character the termination of Ms. Wegner's employment as a resignation rather than a discharge.

97.     However, the facts alleged herein indicate that Ms. Wegner did not resign but was in fact discharged, i.e., fired.  Alternatively, Ms. Wegner was constructively discharged because she could no longer reasonably bear the retaliatory adverse employment conditions and hostile treatment to which she was subjected.

98.     During the meeting in which she was discharged, Howard told Ms. Wegner she must sign the memo without alteration or that "you're not going to work here anymore," and then asked, "what's it going to be?"  Ms. Wegner responded by again explaining that she did not feel safe at work and that she needed her phone to call for help in case anything happened to her. Howard responded, "You sign the form or you're not going to work here" and repeated "so what's it going to be."  Ms. Wegner stated again that she felt unsafe and his threatening tone was making her feel more unsafe and uncomfortable.  She asked whether she would be fired if she did not sign the form.  Howard replied, "You will not work here."  Ms. Wegner repeated she felt unsafe in the workplace.  Taft and Howard laughed at her.  Taft and Howard continued to tell her to sign the form or she would no longer be employed.  When Ms. Wegner did not sign the form, she was told to "leave and have a nice day."  Ms. Wegner asked about her last pay checks. Howard raised his hand and told her again to leave and that he would not discuss anything else.

99.     On September 19, 2015, in a text exchange concerning Ms. Wegner's final paychecks, Brian Jones pretended that Ms. Wegner had resigned and had not been fired.

**Exhibit 11.**

100.     These texts were written in furtherance of the defendants' continuing efforts to establish a pretextual basis for the discriminatory retaliatory discharge of Ms. Wegner.

101.     All of the statements quoted and actions described above were sexual in nature and made with the intent to sexually harass Ms. Wegner. The sexual nature of the statements is apparent on their face and/or apparent in the context within which the statements were made.

102.     All of the events described herein occurred within the scope of employment and during the performance of the job duties of both defendants' employees, managers, operators, and owners.

103.     All of the sexual harassment described herein occurred in the work place, during work hours, while the plaintiff was doing her job. All advances, sexual comments, and physical contact were unwelcome.

104.     The routine and constant sexual comments and actions by numerous employees of both defendants were an integral part of the both defendants' custom, business practice, and course of dealing with the Ms. Wegner.

105.     Ms. Wegner's supervisors and managers at both Car Direct and Beach Auto Brokers, including Howard and Brian Jones, were actually aware of the routine, constant, and outrageous sexual harassment of Ms. Wegner. Ms. Wegner complained about the sexual harassment repeatedly, beginning in June or July, 2014, as described above.

106.     Moreover, the severe harassment was pervasive and part of the working environment at both companies such that the management of both companies was actually or constructively aware of the unlawful work environment independent and apart from Ms.

Wegner's complaints.

107.  Both defendants were negligent in permitting and tolerating a work environment replete with hostile sexual harassment.

108.  Neither defendant took effective corrective action to stop the unlawful sexual harassment after Ms. Wegner repeatedly complained.

109.  Ms. Wegner resisted all sexual advances, verbal and physical, and she complained to management, Brian Jones, Howard and others commenced a campaign of retaliatory action whereby her hours were adjusted to interfere with her school schedule, disproportionately in comparison to other employees; she was shunned by certain colleagues at the dealership; and, as described herein, new policies were put into place that prevented her from effectively doing her job.

110.  Because of the common ownership, management, and culture at Car Direct and Beach Auto Brokers, and because Ms. Wegner was similarly sexually harassed at both companies, and because her complaints were made to Brian Jones regarding both companies, and because Brian Jones was responsibly for managing both companies and thereby responsible for remedying the Ms. Wegner's treatment at both companies, and because Ms. Wegner suffered retaliation at both companies, both defendants, Car Direct and Beach Auto Brokers, are jointly and severally liable for the acts complained of herein.

**COUNT I**
**HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT**

111.  Ms. Wegner restates and realleges the allegations of paragraphs 1-110 of this Complaint as though fully stated herein.

112.    42 U.S.C. § 2000e-2(a) provides that it is an unlawful employment practice for an employer to "(1) discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ... ; or (2) to limit, segregate, or classify his employees .. .in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex".

113.    Ms. Wegner is a member of a protected group, that is, women.

114.    The defendants, Car Direct and Beach Auto Brokers, by and through the defendants' employees, including but not limited to supervisors, violated Ms. Wegner's rights under Title VII (42 U.S.C. § 2000e, *et seq.*) by engaging in actions and/or activities constituting hostile work environment sexual harassment against Ms. Wegner, as alleged above.

115.    These violations by defendants, Car Direct and Beach Auto Brokers, were based upon Ms. Wegner's sex, and affected the terms, conditions, and/or privileges of Ms. Wegner's employment.

116.    As a direct and proximate result of the unlawful conduct of defendants, Car Direct and Beach Auto Brokers, Ms. Wegner has suffered, and will in the future suffer, great damages including front pay; back pay; medical expenses; loss of career opportunities, promotions and advancements; loss of retirement benefits; loss of fringe benefits; embarrassment, humiliation, and inconvenience; severe mental anguish, stress, and pain and suffering; loss of enjoyment of life and other nonpecuniary injury in amounts to be determined at trial.

117.    In addition, Ms. Wegner has incurred and continues to accrue attorneys' fees and other costs related to the prosecution of this action.

## COUNT II
## QUID PRO QUO DISCRIMINATION

118.    Ms. Wegner restates and realleges the allegations of paragraphs 1-110 of this Complaint as though fully stated herein.

119.    42 U.S.C. § 2000e-2(a) provides that it is an unlawful employment practice for an employer to "(1) discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ... ; or (2) to limit, segregate, or classify his employees .. .in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex".

120.    The defendants, Car Direct and Beach Auto Brokers, by and through the defendants' employees, including supervisor Yerigan, violated Ms. Wegner's rights under Title VII by engaging in actions and/or activities *constituting quid pro quo* sexual harassment.

121.    Ms. Wegner has suffered tangible employment actions, resulting from her rejection of her supervisor Yerigan's sexual harassment. These tangible employment actions consisted of the conduct alleged above.

122.    These violations affected the terms, conditions, and/or privileges of Ms. Wegner's employment, in violation of 42 U.S.C. § 2000e, *et seq.*

123.    As a direct and proximate result of the unlawful conduct of defendants, Car Direct and Beach Auto Brokers, Ms. Wegner has suffered, and will in the future suffer, great damages including front pay; back pay; medical expenses; loss of career opportunities, promotions and advancements; loss of retirement benefits; loss of fringe benefits; embarrassment, humiliation,

and inconvenience; severe mental anguish, stress, and pain and suffering; loss of enjoyment of life and other nonpecuniary injury, in amounts to be determined at trial.

124.    In addition, Ms. Wegner has incurred and continues to accrue attorneys' fees and other costs related to the prosecution of this action.

<u>COUNT III</u><br><u>RETALIATION</u>

125.    Ms. Wegner restates and realleges the allegations of paragraphs 1-110 of this Complaint as though fully stated herein.

126.    42 U.S.C. § 2000e-3 provides that it is an unlawful employment practice for an employer to "discriminate against any individual ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. "

127.    Defendants, Car Direct and Beach Auto Brokers, by and through their employees, agents, and officers, including supervisory employees, intentionally, willfully, and wantonly retaliated against Ms. Wegner because of Ms. Wegner's complaints of the unlawful hostile work environment sexual harassment and/or quid pro quo discrimination, in that, after complaining of sexual harassment in violation of Title VII, Ms. Wegner was subjected to unfair and arbitrary treatment, harassment, and interference with the terms, conditions and/or privileges of her employment subsequent to Ms. Wegner formally complaining of the discriminatory and unlawful treatment of her by defendants, Car Direct and Beach Auto Brokers, all as alleged above.

128.    The actions and/or activities of defendants, Car Direct and Beach Auto Brokers, constitute retaliation for Ms. Wegner's complaints of hostile work environment sexual

harassment and/or quid pro quo discrimination, and are in violation of Title VII of the 1964 Civil Rights Act.

129.    As a direct and proximate result of the unlawful retaliation by defendants, Car Direct and Beach Auto Brokers, Ms. Wegner has suffered, and will in the future suffer, great damages including front pay; back pay; medical expenses; loss of career opportunities, promotions and advancements; loss of retirement benefits; loss of fringe benefits; embarrassment, humiliation, and inconvenience; severe mental anguish, stress, and pain and suffering; loss of enjoyment of life and other nonpecuniary injury in amounts to be determined at trial.

130.    In addition, Ms. Wegner has incurred and continues to accrue attorneys' fees and other costs related to the prosecution of this action.

## COUNT IV
## BATTERY

131.    Ms. Wegner restates and realleges the allegations of paragraphs 1-110 of this Complaint as though fully stated herein.

132.    On numerous occasions described herein, defendants' agent and employees intentionally touched Ms. Wegner, said touching was unwanted by Ms. Wegner, and said touching was without justification, excuse, or the Ms. Wegner's consent.  Each of the occasions of unwanted touching described herein constituted battery.

133.    The conduct of the defendants, by and through their agents and employees, was the actual and proximate cause of Ms. Wegner's injuries and damages.

## COUNT V
## ASSAULT

134. Ms. Wegner restates and realleges the allegations of paragraphs 1-110 of this Complaint as though fully stated herein.

135. On numerous occasions described herein, defendants, by and through their agents and employees, purposely, knowingly, recklessly, and wrongfully touched Ms. Wegner and approached her in a manner calculated to cause reasonably apprehension of bodily harm.

136. Such touching and threatening behavior was harmful, unwanted and offensive to Ms. Wegner and caused a reasonable apprehension of harmful, unwanted and offensive contact.

137. The conduct of the defendants, by and through their agents and employees, caused Ms. Wegner to be in reasonable apprehension of harmful, unwanted and offensive conduct and thereby constituted assault.

138. The conduct of defendants, by and through their agents and employees, was the actual and proximate cause of Ms. Wegner's injuries and damages.

## COUNT VI
## NEGLIGENT HIRING AND RETENTION

139. Ms. Wegner restates and realleges the allegations of paragraphs 1-110 of this Complaint as though fully stated herein.

140. Upon information and belief, the defendants failed to properly screen and check the background of employees before hiring, and this negligence resulted in the hiring of an individual who exhibited overly aggressive sexual tendencies.

141. The defendants failed to adequately train their employees.

142. Defendants became aware of their employees ongoing sexually aggressive

tendencies and nonetheless retained them as an employee. The defendants were actually and/or constructively aware of numerous employees propensity to make unwelcome sexual advances, requests and demands for sexual favors, and other verbal and physical conduct of a sexual nature by various words and acts.

143.    The defendants failed to exercise reasonable care in placing individual with known propensities to sexually harass female co-workers in an employment position. Due to the circumstances of the employment, as alleged above, it was foreseeable defendants' employees would harass and harm Ms. Wegner.

144.    The defendants failed to exercise reasonable care and were negligent in hiring and retaining the employees identified herein.

145.    Defendants' actions constituted the torts of negligent hiring and retention.

146.    The manner of the harm and injuries Ms. Wegner sustained were reasonably foreseeable.

147.    The negligent acts of the defendants in negligently hiring and retaining the employees identified herein were both the actual cause and the proximate cause of Ms. Wegner's injuries and damages.

## Prayer for Relief

WHEREFORE, plaintiff, Kelsey Leigh Antee (formerly known as and herein referred to as Ms. Wegner), prays that this Court enter judgment in her favor and against the defendants, jointly and severally, on the above counts, and further:

A.    Award on Count I, Count II, and Count III, judgment in favor of the plaintiff, Ms. Antee, and against the defendants, Car Direct and Beach Auto Brokers, jointly and severally, and

entry of an order for all relief available under Title VII of the Civil Rights Act of 1964, as amended, including but not limited to front pay, back pay, and interest (pre-judgment and post-judgment) on those amounts, in amounts to be determined at trial; Fifty Thousand and No/100 Dollars ($50,000.00), or whatever amount may be proven at trial, for compensatory and punitive damages pursuant to 42 U.S.C. § 1981 a(b)(3); and Ms. Antee's attorneys' fees and costs in this action, including expert fees, pursuant to 42 U.S.C. § 2000e-5(k);

B.     Enter a declaratory judgment that the practices complained of are unlawful and in violation of the plaintiff Ms. Antee's rights; and

C.     Preliminarily and permanently enjoin the defendants, Car Direct, LLC and Beach Auto Broker, Inc., from engaging in such unlawful practices, policies, customs, and usages and from continuing any and all other practices shown to be in violation of applicable law; and

B.     Award on Ms. Antee on her common law counts (Counts IV, V, and VI) for assault, battery, and negligent hiring and retention, plaintiff prays for an award of Two Million Dollars ($2,000,000) in compensatory damages, together with interest from January 15, 2014.

D.     Award the plaintiff, Kelsey L. Antee, such other and further relief as the Court deems just and equitable under the circumstances.

### JURY DEMAND

Plaintiff, Kelsey L. Antee, demands a trial by jury.

Respectfully Submitted,

KELSEY L. ANTEE

By: _____
       Of Counsel

Page 30 of  31

Jeremiah A. Denton III, Esq., VSB #19191
Rhiannon M. Jordan, Esq., VSB #78650
Jeremiah A. Denton IV, Esq., VSB #83818
Jeremiah A. Denton III, P.C.
477 Viking Drive, Suite 100
Virginia Beach, VA 23452
Tel: 757/340-3232
Fax: 757/340-4505
jerry@jeremiahdenton.com
rhiannon@jeremiahdenton.com
jake@jeremiahdenton.com